**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 8, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DEANDRE A. FREEMAN,

Defendant-Appellant.

No. 05-3437

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 05-CR-10102-MLB)**

Kurt P. Kerns of Ariagno, Kerns, Mank & White, LLC, Wichita, Kansas, for Defendant-Appellant.

Matthew T. Treaster, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), Wichita, Kansas, for Plaintiff-Appellee.

Before **HENRY**, **HOLLOWAY**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

The Kansas Department of Corrections (KDOC) has established criteria for the search of the person or property of parollees in the state. These criteria are contained in a policy statement called the Internal Management Policies and Procedures (IMPP). They specify that "with the exception of pat-down and plain

view searches, special enforcement officers are the only personnel authorized to conduct a more extensive search of offenders' person or property." Supplemental Vol. I, IMPP 14-164, 1. The IMPP permit warrantless searches under the following circumstances: "If the Special Enforcement Officer (SEO) has a reasonable suspicion that evidence of a condition violation can be found on the person, or in the property in possession of the offender, the officer may conduct a search of the person or property without a warrant." *Id.* at 7.

Upon being released on parole from Kansas state prison, defendant Deandre Freeman signed a Conditions of Post Release Supervision agreement, which read: "I agree to subject [sic] to a search by parole officer(s) of my person, residence, and any other person under my control." *United States v. Freeman*, No. 05-10102-01-MLB, slip-op at 2 (D. Kansas Aug. 11, 2005).

On October 1, 2004, law enforcement officers conducted a warrantless search of Mr. Freeman's residence without his consent and discovered a firearm, body armor, and a small quantity of marijuana. No SEO was present at the time of the search. The district court held that the search was lawful because, at the time of the search, the police officers had reasonable suspicion to believe that Mr. Freeman was violating the conditions of his parole.

Following the denial of his motion to suppress, Mr. Freeman pled guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). As part of the plea agreement, he preserved his right to appeal the district court's

denial of his motion to suppress, which he does in the instant appeal. For the reasons stated below, we REVERSE the district court's denial of the motion to suppress.

## I.

Mr. Freeman was paroled on October 3, 2002. While on parole, Mr. Freeman violated curfew and was placed under more intensive supervision by the Wichita Day Reporting Center (DRC), a parolee monitoring company employed by the Kansas Department of Corrections (KDOC). On the night of September 30, 2004, the DRC, with the assistance of several local law enforcement agencies, conducted a sweep of parolees designed to determine whether parolees were in compliance with curfew and to verify that their GPS- tracking ankle bracelets were functioning. DRC instructed law enforcement to obtain written consent to search the residence of each parolee visited, but also instructed them that refusal to consent constituted a violation of the parolee's parole agreement. Although some of the parolees selected for curfew check were chosen because of specific concerns of their parole officers, others, including Mr. Freeman, were chosen at random.

Around 1:00 AM the morning of October 1, 2004, four police officers from the Wichita Police Department knocked on Mr. Freeman's front door. Bridgette Franklin, a representative from DRC, accompanied the officers to check Mr. Freeman's ankle bracelet and GPS unit. However, she was not an SEO authorized

to conduct parolee searches under the KDOC IMPP. When Mr. Freeman answered the door, Officer Little explained that they were there to conduct a curfew check and to ensure that the ankle bracelet monitoring device was functioning. Mr. Freeman invited the officers into his home.

As Ms. Franklin checked the monitoring device, Officer Little informed Mr. Freeman of their intention to search the premises. Mr. Freeman told him that the officers had no right to search. When Officer Little replied that they could search because Mr. Freeman had agreed to the search as part of the terms of his parole, he became agitated and began to walk quickly out of the living room toward the bedroom. As he walked, he told the officers that he needed to inform his girlfriend, Maria Coleman, of the officers' search because she was in bed and possibly undressed. Out of concern for officer safety, Officer Little followed Mr. Freeman to prevent him from entering the bedroom. He instructed Mr. Freeman to tell Ms. Coleman of the search from the hallway and then to return to the living room. Mr. Freeman complied with his request.

From the hallway, Officer Little could see Ms. Coleman reaching for something in the dresser. After ensuring that Mr. Freeman was returning to the living room, Officer Little entered the bedroom and proceeded to search. Ms. Coleman left the bedroom as Officer Little entered. Although the police officers had obtained written consent for all previous searches conducted that evening, they did not obtain Mr. Freeman's consent.

Officer Little's initial search of the bedroom did not uncover anything illegal. While he was engaged in the search, another officer, Sergeant Walker, entered the room and saw a handgun in plain view on the closet shelf. Further search of the house uncovered a bullet-proof vest in the same closet as the gun and marijuana seeds and stems in the basement. Based on this evidence, Mr. Freeman was charged with possession of a firearm in violation of 18 U.S.C. 922(g)(1).

Mr. Freeman moved to suppress the evidence found in the search on the ground that it was the fruit of a warrantless search. The district court found that the search did not comply with the parole agreement because it was not conducted by an SEO. It also determined that the police officers had no right to search Mr. Freeman's home without his consent at the time they arrived. The court found, however, that Mr. Freeman's parolee status created a diminished expectation of privacy that allowed law enforcement officers to search if they had reasonable suspicion that Mr. Freeman was violating the conditions of his parole. Based on Mr. Freeman's agitation in response to hearing the officers' intention to search, Ms. Coleman's actions in the bedroom, and Mr. Freeman's status as a convicted felon and known gang member, the court found that such reasonable suspicion existed. The district court therefore denied Mr. Freeman's motion to suppress.

We review the facts found by the district court for clear error and its determination of the reasonableness of the search *de novo*. *United States v. Tucker*, 305 F.3d 1193, 1199 (10th Cir. 2002).

**II.**

The Supreme Court has created two exceptions to the Fourth Amendment's warrant requirement in the context of parolee searches. First, in *Griffin v. Wisconsin*, the Supreme Court held that "[s]upervision [of parolees]. . . is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large." 483 U.S. 868, 875 (1987).[1] Because parole has the dual purpose of rehabilitating the offender and protecting society, it is constitutionally reasonable for a parole officer to search parolees in compliance with a parole agreement search provision, but without a warrant. *Id.* at 875-76. Moreover, this Court has held that "[i]n many cases, the police may . . . search a probationer's premises without a warrant at the behest of the parole officer." *United States v. McCarty*, 82 F.3d 943, 947 (10th Cir. 1996). Neither this Court nor the Supreme Court has, however, blessed a search by law enforcement acting independently of the parole officer under this rationale.

---

[1]Though "parolees have fewer expectations of privacy than probationers", the Supreme Court instructs us to apply the same balancing test to each in determining the constitutionality of a search. *Samson v. California,* ___ U.S. ___, 126 S. Ct. 2193, 2198, (2006).

-6-

Second, the Court expanded *Griffin* by holding in *United States v. Knights*, 534 U.S. 112, 118 (2001), that searches performed in compliance with a valid parole agreement search provision may be constitutional even if they were not "conducted by a probation officer monitoring whether the probationer is complying with probation restrictions." *Id.* at 117. To determine whether such a search is reasonable under the Fourth Amendment, a court must balance "'on one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Id.* at 119 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

In *Knights*, a detective suspected that defendant Mark James Knights was involved in several acts of vandalism and arson against Pacific Gas & Electric because the crimes coincided with a complaint for theft of services PG & E filed against him and with PG & E's termination of his electric service. *Id.* at 114-15. After observing suspicious objects in the truck of the suspected accomplice, which was parked at Knights's apartment complex, the detective decided to search Knights's apartment. *Id.* The detective believed he could conduct the search without a warrant because Knights had signed a probation agreement in conjunction with an unrelated drug offense, which required him to submit to a search at any time without cause by either a probation or law enforcement officer.

*Id.* The search uncovered significant evidence of Knights's involvement in the crime. *Id.*

The Court determined that the detective's search of Knights's apartment was reasonable. Knights had a diminished expectation of privacy because, by signing the parole agreement, Knights became aware that he was subject to search by law enforcement. *Id.* at 119-20. On the other side of the balancing test, the government's interest in protecting society was bolstered both by Knights's status as a probationer—a group much more likely than an average citizen to commit a crime—and by the detective's reasonable suspicion that Knights himself was involved in criminal activity. *Id.* at 119-20.

This Circuit has interpreted *Knights* to mean that "a probation search [is] permissible so long as supported by reasonable suspicion, regardless of the motivation for the search." *Tucker*, 305 F.3d at 1200. In *Tucker*, the defendant argued that the search was merely a subterfuge for law enforcement purposes and thus not in compliance with the Utah law requirement that the search be conducted for parole purposes. This court responded that one of the requirements of Tucker's parole was that he obey all federal, state, and municipal laws. *Id.* Because the search was premised on reasonable suspicion that he had violated the law, the search complied with the parole agreement search provision, which made the case "materially indistinguishable from *Knights*." *Id.*

In *Samson v. California*, 126 S. Ct. 2193 (2006), the Supreme Court extended the principle of *Knights* to uphold a warrantless search of a parolee even in the absence of reasonable suspicion, where the parolee had signed a parole agreement that allowed parole officers or other peace officers to search the parolee "with or without a search warrant and with or without cause." *Id.* at 2196. The Court noted "that some States and the Federal Government require a level of individualized suspicion," and strongly implied that in such jurisdictions a suspicionless search would remain impermissible. *Id.* at 2201. Parolee searches are therefore an example of the rare instance in which the contours of a federal constitutional right are determined, in part, by the content of state law.

We interpret the *Griffin* line of cases, based on "special need," as resting on the rehabilitative relationship between the parolee and the parole officer, and thus not extending to other law enforcement officers unless they are acting under the direction of the parole officer. We interpret the *Knights-Samson* line of cases as resting on the parolee's diminished expectation of privacy stemming from his own parole agreement and the state regulations applicable to his case. As we shall see, neither rationale justifies the search in this case.

### III.

The search of Mr. Freeman's residence was conducted by ordinary officers from the Wichita Police Department. No parole officers (denominated SEOs in the jargon of the Kansas Department of Corrections) were present, and no parole

-9-

officer instructed the officers to conduct the search. Bridgette Franklin, a representative of the private parolee monitoring agency, accompanied the officers during the initial entry, but she was not an SEO and, in any event, she left the premises before the search.

This is legally significant in two respects. First, because the search was conducted by ordinary law enforcement agents and not by Mr. Freeman's parole officer, the search cannot be justified under the special needs rationale of *Griffin*. Second, because the Kansas parole agreement signed by Mr. Freeman allowed searches only by SEOs, the search of Mr. Freeman's residence did not comply with the search provision in his parole agreement or with the KDOC's relevant parolee search policies. Moreover, the KDOC rules specify that a warrantless search may be conducted only on reasonable suspicion that the parolee has violated his parole agreement. Thus, when ordinary law enforcement officers conducted a search without reasonable suspicion of a parole violation, the search exceeded reasonable expectations in two respects, and was impermissible under the Fourth Amendment balancing test described in *Samson*.

The government argues that the search of Mr. Freeman's residence was valid under *Knights* because he had a diminished expectation of privacy as a result of his parole agreement, even though the search conducted did not comply with the search provision in that agreement. It further argues that based on *Samson*, the officers did not need reasonable suspicion to conduct the search.

However, unlike the search provision in Mr. Freeman's parole agreement, the search provision in the California parole agreements in *Samson* allowed any law enforcement officer to search for any purpose without reasonable suspicion. This significantly diminished the expectation of privacy for those on parole in the California system. *Samson* does not represent a blanket approval for warrantless parolee or probationer searches by general law enforcement officers without reasonable suspicion; rather, the Court approved the constitutionality of such searches only when authorized under state law. Kansas has not gone as far as California in authorizing such searches, and this search therefore was not permissible in the absence of reasonable suspicion.

## IV.

The district court upheld the search of Mr. Freeman's home on the ground that the officers had reasonable suspicion that he was in violation of the terms of his parole. "[R]easonable suspicion is merely a particularized and objective basis for suspecting criminal activity." *Tucker*, 305 F.3d at 1200. Although an officer must have "'some minimal level of objective justification,'" *INS v. Delgado*, 466 U.S. 210, 217 (1984), the justification is less than that requirement for a showing of probable cause. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989). To determine whether reasonable suspicion for suspecting a parole violation exists, we consider the quantity and reliability of the information possessed by law

enforcement and consider this information in light of the totality of the circumstances. *Id.* at 8.

The district court found that the officers had no reasonable suspicion when they entered Mr. Freeman's home, but that circumstances that developed during the course of the officers' encounter with Mr. Freeman gave rise to such suspicion. The district court pointed to three reasons to suspect Mr. Freeman of wrongdoing: his agitation on learning of the officers' intention to search the home, Ms. Coleman's reach to the bedside table, and Mr. Freeman's criminal record. Considering the totality of the circumstances, we disagree with the district court and find that officers had no objective justification for reasonable suspicion to conduct a search of Mr. Freeman's residence.

Refusal to consent to a search—even agitated refusal—is not grounds for reasonable suspicion. *United States v. Santos*, 403 F.3d 1120, 1125-26 (10th Cir. 2005); *United States v. Williams*, 271 F.3d 1262, 1268 (10th Cir. 2001). To be sure, Mr. Freeman became agitated on learning of the officers' intention to search. But his agitation can easily be explained by the impending invasion of his girlfriend's privacy. We suspect many innocent men would become agitated if male officers in the middle of the night stated their intention to enter the bedroom where their wife or girlfriend was in bed, possibly undressed. The fact that Mr. Freeman knew the officers had no lawful right to search may also have contributed to his agitation. Still, however agitated Mr. Freeman supposedly was,

-12-

he complied with the officer's instruction to communicate with Ms. Coleman from the hallway and then to return to the living room.

The second indication of reasonable suspicion invoked by the district court was Ms. Coleman's action in response to Mr. Freeman's announcement of the officer's presence: she sat up in bed and reached for something in the dresser. To characterize this as suspicious is not persuasive. The officers had no reason to assume she was dangerous. Her movements in the bedroom were not threatening and were entirely consistent with being rousted out of bed at 1:00 in the morning. It is surely common for a person stirred from bed to reach to the dresser for a watch, glasses, robe, or other item.

Nor was Mr. Freeman's parolee status and criminal history, without other particularized and objective facts, sufficient to form reasonable suspicion. Though officers knew of Mr. Freeman's past association with a gang, he had been on parole for two years with only one violation—missing curfew. Presumably all parolees have criminal records, and if this were sufficient to warrant reasonable suspicion, there would effectively be no limits on the ability of law enforcement officers to conduct warrantless searches of parolees' homes. Such a result conflicts with the Supreme Court's decision establishing such limits. *See Samson*, 126 S. Ct. at 2198 n.2.

Even evaluating these factors based on the totality of the circumstances, as we must, *Santos*, 403 F.3d at 1133, we cannot agree with the district court that the

-13-

officers had reasonable suspicion to search Mr. Freeman's home without consent, without the presence of a parole officer, and in violation of Kansas Department of Corrections rules governing parolee searches.

**V.**

The government contends, in the alternative, that the search of Mr. Freeman's residence should be upheld as a "protective sweep" because the officers reasonably believed they were in danger. "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). For a *Buie* search to be upheld under the Fourth Amendment, officers must have "possesse[d] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed] the officer in believing, that the area swept harbored an individual posing a danger to the officer or others." *Id.* (quoting *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983)) (internal quotation marks omitted).

This Court has interpreted *Buie* to mean that a protective sweep may be conducted only if incident to arrest. *United States v. Walker*, ___F.3d___, WL 259661, at *4 (10th Cir. January 31, 2007); *United States v. Davis*, 290 F.3d 1239, 1242 n.4 (10th Cir. 2002). Other circuits have allowed protective sweeps not incident to arrest when officers suspect that a dangerous individual may be hiding on the premises. *United States v. Taylor*, 248 F.3d 506, 513-14 (6th Cir.

2001) (permitting a cursory search of the premises for people who may threaten an officer's safety while he waits for a search warrant to be obtained); *United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1993) (allowing cursory search of the premises for persons who may threaten the safety of the officers); *United States v. Patrick*, 959 F.2d 991, 996-97 (D.C. Cir. 1992) (permitting a search when officers reasonably suspected that an individual on the premises was trafficking in narcotics). One member of this court has expressed doubts that *Buie* "lay[s] down a flat, per se rule banning protective sweeps by law enforcement in every other context." *United States v. Garza*, 125 Fed.Appx. 927, 933 (10th Cir. 2005) (Tymkovich, J., concurring) (unpublished). There may be merit to that position, but the panel is bound by the precedent of *Davis*. Even if this court were to adopt a broader view of the protective sweep, it is likely this search would still be invalid because the officers had no objectively reasonable belief that another person in Mr. Freeman's residence threatened their safety.

Accordingly, we REVERSE the district court's denial of the Motion to Suppress and REMAND for proceedings consistent with this opinion.