(170 P.3d 894)
No. 96,663

STATE OF KANSAS, *Appellee,* v. CHRISTOPHER L. UHLIG, *Appellant.*

Opinion filed November 2, 2007.

*Thomas J. Bath, Jr.,* and *Tricia A. Tenpenny,* of Bath & Edmonds, of Overland Park, for appellant.

*Steven J. Obermeier,* assistant district attorney, *Amanda Voth,* legal intern, *Phill Kline,* district attorney, and *Paul J. Morrison,* attorney general, for appellee.

Before RULON, C.J., ELLIOTT and HILL, JJ.

HILL, J.: Christopher L. Uhlig was convicted of possessing methylenedioxymethamphetamine, a drug commonly known as ecstasy. The ecstasy was found by a court services officer when she searched his bedroom. Uhlig unsuccessfully sought to suppress the drug evidence and now asks us to overturn his conviction because of this warrantless search. But probationers do not enjoy the absolute liberty to which every citizen is entitled. For example, one condition of Uhlig's juvenile probation required him to submit to searches "at home, school, work or elsewhere" as directed by his court services officer. Before this search, Uhlig admitted to the officers that during a delay in allowing the officers entry into his bedroom, he was trying to hide his cigarettes from them. Possession of tobacco was a violation of his probation. Based on those facts, we hold that the officers had reasonable suspicion to search his room. We affirm the trial court's denial of the motion to suppress.

Uhlig further contends that we should suppress any statements he gave to the officers because they had not warned him of his constitutional rights as required by the *Miranda* decision. Warnings must be given to all in custody before their interrogation. Because Uhlig was not in custody during the search of his room when he replied to the officers' questions, we hold the officers were not required to give a *Miranda* warning. We affirm the trial court's denial of Uhlig's motion to suppress his answers to the officer's questions.

We first review some principles of the law of search and seizure when dealing with searches of probationers. Next, we look at what the record reveals about the actions of Uhlig and the officers with respect to the search. Finally, we decide if the officers needed to

give the *Miranda* warning in order to make Uhlig's answers admissible.

*The law recognizes different search standards for probationers.*

Generally, probable cause is required to search a person's home. But, our Supreme Court employs different standards when evaluating the reasonableness of searches of convicts. Three United States Supreme Court cases, *Griffin, Knights,* and *Samson,* provide the foundation for the Fourth Amendment search and seizure analysis necessary in this case.

These standards began to diverge with the ruling by the Court in *Griffin v. Wisconsin,* 483 U.S. at 870-71, 97 L. Ed. 2d 709, 107 S. Ct. 3164 (1987), where the Court upheld a Wisconsin regulation that permitted the warrantless search of a probationer's residence as long as there are "reasonable grounds" to believe that the probationer is violating probation.

The *Griffin* Court held that the State of Wisconsin was justified in replacing the probable cause standard used in the Fourth Amendment with a reasonable grounds standard due to the "special needs" of the government when it must supervise probationers. 483 U.S. at 873. The Court explained that probationers do not enjoy " 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.' [Citation omitted.]" 483 U.S. at 874. The Court reasoned that such a policy would encourage rehabilitation of the probationer, reduce the likelihood of recidivism, and protect the community. A state's operation of its probation system presents a "special need" for intense supervision to assure that probation restrictions are in fact observed by probationers. 483 U.S. at 875.

We must point out that in *Griffin,* the officers had independent information that the probationer was violating probation, facts which led them to conduct the search in the first place. Here, the officers were conducting a random search and had no knowledge of any probation violation sufficient to cause them to make the visit to Uhlig's home.

What was planted in *Griffin* bloomed in *United States v. Knights*, 534 U.S. 112, 151 L. Ed. 2d 497, 122 S. Ct. 587 (2001), where the Court upheld the warrantless search of a probationer that was supported by reasonable suspicion. In *Knights*, the probation agreement required Knights to submit his person, property, and place of residence to search at anytime, with or without a search warrant or reasonable cause. After seeing some bomb-making materials in Knights' truck, police officers, knowing he was on probation, searched his apartment. This search was upheld.

We must first point out that the *Knights* Court refused to rule whether the acceptance of the probation conditions amounted to a consent to search. Instead, the Court decided the matter by using general Fourth Amendment analysis techniques of first examining all of the circumstances of the search and including the probation condition as a salient circumstance. The Court identified the balance between privacy and governmental needs with these words:

"The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individuals's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " 534 U.S. at 118-19 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300, 143 L. Ed. 2d 408, 119 S. Ct. 1297 [1999]).

Ultimately, the Court held that the balance of these governmental considerations and the privacy rights of the individual requires no more than reasonable suspicion to conduct a search of a probationer's house. "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." 534 U.S. at 121.

A different cause standard was once again used in *Samson v. California*, 547 U.S. 843, 857, 165 L. Ed. 2d 250, 126 S. Ct. 2193 (2006), where the court upheld a search in which the officer searched a parolee for no reason other than the fact that he was a known parolee. In *Samson*, the parole agreement stated that Samson was subject to search or seizure at any time by a parole or other peace officer, with or without a search warrant or probable cause.

A police officer, knowing that Samson was on parole, searched Samson and found drugs in his jacket pocket. This search was upheld using the same technique of balancing Samson's privacy rights (substantially reduced by his parole status) and the needs of California to supervise its parolees.

The *Samson* Court refused to require a showing of reasonable suspicion, as used in *Knights*: stating: "Imposing a reasonable suspicion requirement . . . would give parolees greater opportunity to anticipate searches and conceal criminality. [Citations omitted.] This Court concluded that the incentive-to-conceal concern justified an 'intensive' system for supervising probationers in *Griffin*. That concern applies with even greater force to a system of supervising parolees." 547 U.S. at 854. The *Samson* Court placed significance on the fact that the probationer had been informed of the probationary search condition and was unambiguously on notice of its terms, as was similarly noted in *Knights*. 547 U.S. at 852; see *Knights*, 534 U.S. at 119.

Also pertinent to this case, *Samson* makes a distinction between probationers and parolees. The Court held that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation." 547 U.S. at 850. This statement suggests to us a continuum:

- Prisoners have no expectation of privacy (see *Hudson v. Palmer*, 468 U.S. 517, 530, 82 L. Ed. 2d 393, 104 S. Ct. 3194 [1984],) and lack Fourth Amendment rights (they can therefore be searched at any time for any reason);
- parolees have a slight expectation of privacy and therefore can be searched in the absence of reasonable suspicion, but not arbitrarily or capriciously (*Samson*, 547 U.S. at 855-56); and
- probationers have a higher expectation of privacy than parolees, but no standard is set forth.

Such lessons are clear. The law of search and seizure varies based upon the status of the individual searched. First, *Griffin* indicates that probable cause is not required when a search of a probationer is made because of the special needs of the government. According to *Griffin*, a state regulation only requiring reasonable grounds to

search is constitutionally sufficient. Second, *Knights* teaches that reasonable suspicion is sufficient when a search of a probationer is made. The reasonableness of the search is determined by applying a balancing test that gives much weight to the government's strong interest in allowing the search. Third, *Samson* indicates that no suspicion is required when a search of a parolee is made, but the opinion fails to set the standard for probationers.

*Uhlig's actions created a reasonable suspicion to search.*

Court services officer Sandra Miller, accompanied by Overland Park Police Officer Robert Flemming, visited the home of Uhlig in March 2005. This visit was conducted according to a condition of Uhlig's probation agreement that stated "The CSO (court services officer) and/or Law Enforcement Officers have the authority to visit the respondent at home, school, work or elsewhere, and the Respondent shall submit to searches as directed by CSO." This consent-to-search provision is the basis of the "Night Light" program in that district. Night Light visits are random visits conducted between 5 and 10 p.m. by court services officers in order to ensure that probationers are complying with the terms and conditions of probation. In that district, the court services officer conducting the visit is accompanied by a law enforcement officer. If the officers are denied admission into the homes, the matter is referred back to the court. The officers apparently do not try to force entry and search.

Before arriving at Uhlig's home, the officers had no reason to believe that Uhlig had violated his probation. The officers were met at the door by Uhlig. The officers explained who they were, that they were there for a Night Light visit, and asked if they could enter the house and search the probationer's room in compliance with the probation conditions. Uhlig consented, opened the door, and motioned for the officers to enter.

The officers entered the home and asked Uhlig to get his father. (It was their practice to seek the consent of a parent for admission to a juvenile's home in order to inform the parents about why they were there.) Uhlig stated that his father was upstairs sleeping and went upstairs to get him. While the officers waited at the entry,

they heard things being moved around upstairs and saw no sign of Uhlig's father. The officers then learned from Uhlig's sister that Uhlig was actually in his own room. After a couple of minutes, Officer Flemming called out to Uhlig to come back down. Concluding that there had been plenty of time for Uhlig to have retrieved his father, the officers proceeded up the stairs. The officers testified that they also moved up the stairs for their own safety because they were not sure what Uhlig was doing. They met Uhlig on his way downstairs. Flemming asked Uhlig why he was upstairs for so long. Uhlig responded that he was hiding his cigarettes. Possession of cigarettes was a violation of provision No. 14 of Uhlig's juvenile probation.

After hearing that he was hiding cigarettes, the officers went to Uhlig's bedroom where court services officer Miller found some pills in a tin box inside the pocket of a jacket lying on the bed. Police officer Flemming asked Uhlig what the pills were, and Uhlig replied that he did not know. Flemming then asked Uhlig where he got the pills, and Uhlig admitted that he had found them. Laboratory testing revealed that the pills contained methylenedioxymethamphetamine.

Uhlig asked the district court to suppress the drug evidence. His motion was denied. When reviewing a district court's denial of a motion to suppress, this court considers all of the circumstances and examines the evidence in a light most favorable to the State. *State v. Hardyway*, 264 Kan. 451, 459, 958 P.2d 618 (1998).

We hold Uhlig's attempt to delay the officer's search and his admission of attempting to conceal cigarettes was an undeniable violation of his probation and gave the officers reasonable suspicion to search his room.

Uhlig was aware of the terms and conditions of his probation since they were written in plain language. The officers advised him why they were there. Uhlig then attempted to hide contraband from them and admitted that to them. This case is in clear contrast with *United States v. Freeman*, 479 F.3d 743, 748 (10th Cir. 2007), where the Tenth Circuit Court of Appeals refused to uphold the search of a parolee because: (1) there was no special enforcement officer (similar to a CSO) present, and (2) the Kansas Department

of Corrections regulations specifically required reasonable suspicion in order to conduct a warrantless search of a parolee.

Like this case, though, the search in *Freeman* was random and Freeman invited the officers into his home after they explained that they were officers and that they were there for a curfew check according to Freeman's parole agreement. But Freeman refused to give consent to search when the officers asserted the right to search the home. The officers searched the bedroom of the parolee despite this refusal, asserting that they were doing so for safety purposes due to the presence of another person in the bedroom. 479 F.3d at 745. A handgun was found by one of the officers on a shelf in the bedroom. As a parolee, Freeman could not possess a firearm. We conclude that *Freeman* does not alter our view that these two officers had a reasonable suspicion that contraband could be found in Uhlig's room.

Uhlig asks us to rule that reasonable suspicion is required in all cases dealing with searches of probationers. We decline to so rule because there was reasonable suspicion for these officers to search Uhlig's room and no such rule is needed to make this decision. Balancing the State's need to supervise its probationers with Uhlig's diminished expectation of privacy due to his status as a probationer, we hold the district court was correct when it denied Uhlig's motion to suppress the fruits of the search.

*Uhlig was not in custody when he answered the officers' questions.*

Uhlig contends his statements to the officers should have been suppressed. Our standard of review of such questions requires an examination of facts and law:

"In reviewing a district court's decision regarding suppression, this court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard with independent judgment. This court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. [Citation omitted.]" *State v. Ackward,* 281 Kan. 2, 8, 128 P.3d 382 (2006).

In fact, when reviewing a district court's denial of a motion to suppress, this court " 'consider[s] the totality of the circumstances

and view[s] the evidence in a light most favorable to the government.' " *Hardyway*, 264 Kan. at 459.

Specifically, our Kansas Supreme Court has ruled that "courts must examine 'all of the circumstances surrounding the interrogation' [citation omitted] and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her "freedom of action." ' [Citation omitted.]" *State v. Jones*, 283 Kan. 186, 193, 151 P.3d 22 (2007).

The issue here is whether Uhlig was in custody for purposes of the warning required by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Kansas courts consider various factors when determining whether a person is "in custody" for purposes of *Miranda*. See *State v. Ewing*, 258 Kan. 398, 403, 904 P.2d 962 (1995) (defendant was in custody when officer ordered him to stop at gunpoint and asked who shot the victim), *State v. Woolverton*, 284 Kan. 59, 70-73, 159 P.3d 985 (2007) (defendant not in custody when questioned in stairwell of his own apartment building). Therefore, we must review the facts from the record.

The record discloses that the officers were in Uhlig's home with his consent. When Officer Flemming asked Uhlig what he had been doing upstairs, he responded that he was hiding cigarettes. Although that is an admission of a probation violation, it was not an admission of a crime that the *Miranda* warning protects. It has been held that a probationer may be required to answer questions concerning matters relevant to probation that pose no realistic threat of incrimination in a separate criminal proceeding. See, *e.g.*, *State v. Lumley*, 267 Kan. 4, 11, 977 P.2d 914 (1999); *State v. Aldape*, 14 Kan. App. 2d 521, 523, 794 P.2d 672, *rev. denied* 247 Kan. 705 (1990). Uhlig was not placed under arrest or detained. Uhlig simply answered Officer Flemming's two questions regarding the pills, and the facts indicate no showing of coercion or threat by Flemming in obtaining these responses. Furthermore, Uhlig was in his own home, a place of familiarity within his own environment. Officer Flemming did not draw a weapon, place Uhlig in handcuffs, or give any indication that Uhlig was under arrest. We do not consider Uhlig in custody for purposes of *Miranda* under these circumstances.

Uhlig also contends that he was effectively prevented from asserting his Fifth Amendment privilege because doing so would have caused him to commit a violation of his probation. We do not think so. The terms of probation employed here did not state that Uhlig must waive his Fifth Amendment rights. It only required him to obey persons of authority, a requirement that relates primarily to his probation relationship, not his potential interaction with police officers regarding other crimes. Furthermore, Uhlig has never claimed that he only spoke out of fear of a probation revocation.

These facts are different than those in *Minnesota v. Murphy*, 465 U.S. 420, 79 L. Ed. 2d 409, 104 S. Ct. 1136 (1984), where the probationer made incriminating statements to his probation officer during a routine probation meeting. The Court held that the fact that he was on probation and was required to be truthful to his probation officer according to the terms of his probation agreement did not turn his voluntary statements into involuntary statements. The Court stated, "The answers . . . to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege." 465 U.S. at 427. The Court explained that the Fifth Amendment speaks to compulsion, and that the privilege does not preclude a witness from testifying voluntarily regarding matters that may incriminate the witness. 465 U.S. at 427; *United States v. Monia*, 317 U.S. 424, 427, 87 L. Ed. 376, 63 S. Ct. 409 (1943).

Again, Uhlig was not required to answer over some claim of privilege. We see no Fifth Amendment violation here.