No. 111,131

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JEREMY A. CHAPMAN
*Appellant*.

SYLLABUS BY THE COURT

1.

In reviewing the granting or denial of a motion to suppress evidence, the appellate court determines whether the factual findings underlying the district court's suppression decision are supported by substantial competent evidence. The appellate courts do not reweigh the evidence or reassess the credibility of witnesses. The ultimate legal conclusion drawn from those factual findings is reviewed under a de novo standard.

2.

Under the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights, individuals have the right to be free from unreasonable governmental searches and seizures.

3.

Generally, the State must have a warrant based on probable cause to search a person's home. However, the warrantless search of a person's home may, under some circumstances, be deemed reasonable. One such circumstance exists when the home being searched belongs to a parolee. Parolees have a greatly diminished expectation of privacy, even in their homes, particularly when the parolee has been informed that he or

she may be subject to searches as a condition of release. Thus, the government's intrusion on a parolee's privacy may be supported by a diminished level of suspicion.

4.

Pursuant to K.S.A. 2012 Supp. 22-3717(k)(3), parolees and persons on postrelease supervision are, and shall agree in writing to be, subject to search or seizure by any law enforcement officer based on reasonable suspicion of the person violating conditions of parole or postrelease supervision or reasonable suspicion of criminal activity.

5.

The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. An appellate court must first attempt to ascertain the legislative intent through the statutory language enacted, giving common words their ordinary meanings.

6.

When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the legislature's intent.

7.

K.S.A. 2012 Supp. 22-3717(k)(3) provides that a parolee shall agree in writing to be subject to search or seizure by law enforcement officers based on reasonable suspicion. Based on the plain and unambiguous language of the statute, a parolee's written agreement is a condition for a law enforcement officer's search of a parolee's

2

home based on reasonable suspicion. Otherwise, the statutory language would be rendered meaningless.

8.

Consent is an exception to the search warrant requirement. For a consent to search to be valid, two conditions must be met: (1) There must be clear and positive testimony that consent was unequivocal, specific, and freely given and (2) the consent must have been given without duress or coercion, express or implied. The State has the burden of establishing the scope and voluntariness of the consent to search.

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed April 10, 2015. Reversed and remanded with directions.

*Heather Cessna*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., PIERRON and ATCHESON, JJ.

MALONE, C.J.: Jeremy A. Chapman appeals following his convictions of two counts of identity theft and two counts of theft after prior conviction. Chapman raises five issues on appeal: (1) The district court erred in denying his motion to suppress; (2) the prosecutor committed misconduct during closing argument; (3) the district court erred in failing to give a multiple acts instruction; (4) the district court erred in instructing the jury on reasonable doubt prior to the introduction of evidence; and (5) the district court violated his constitutional rights when it sentenced him to an increased sentence, based upon his criminal history, without requiring the State to prove the criminal history to a jury beyond a reasonable doubt. We agree with Chapman that the district court erred in

3

denying his motion to suppress evidence seized during the search of his house. Thus, we reverse and remand with directions to grant Chapman's motion to suppress.

On the morning of August 1, 2012, Deputy Reinhardt Hay of the Sedgwick County Sheriff's Office conducted a routine traffic stop in Wichita. Officer Maurice Mitchell of the Wichita Police Department (WPD) arrived to assist with the stop. The driver of the vehicle, later identified as Lucas Arnold, had multiple outstanding warrants for his arrest. During a subsequent search of the vehicle's glove box, Hay found checks, identification cards, Social Security cards, and birth certificates with different names, addresses, and birth dates on them. Mitchell ran some records checks and informed Hay that many of the documents found inside the glove box had been reported stolen.

As Hay searched the vehicle, Arnold called out to Mitchell from the back of the patrol car and said he wanted to "work something out." Arnold said that he knew a man named Jeremy who was making fake IDs and personal checks. Hay and Mitchell transported Arnold to be interviewed by Detective Roger Bieberle of the WPD's financial crimes section. During the interview, Arnold told Bieberle that a man named Jeremy had made the fake IDs found in the glove box. Arnold said that Jeremy lived in a green house near the northeast corner of Mount Vernon and Lulu Streets. Arnold told Bieberle that Jeremy kept "all kinds" of checks and IDs in a basket beside a pool table in his basement.

Mitchell, Bieberle, and several other WPD officers drove to the area of Mount Vernon and Lulu Streets and found a green house matching the description provided by Arnold. The officers ran a check and learned that the house was registered to Jeremy Chapman. The officers knocked on the door and a man answered. He identified himself as Jeremy and provided identification stating that his full name was Jeremy Chapman. Bieberle explained why the officers were there and asked Chapman if they could search the house. Chapman refused to grant the officers entry.

4

As Bieberle spoke with Chapman, Mitchell ran a records check and learned that Chapman was on parole. Mitchell contacted Chapman's parole officer, David Evans, who verified that Chapman was on parole and lived at the house where the officers were located. Mitchell explained that he had information that Chapman might be providing fake checks and IDs, and he told Evans that Chapman had refused a request to search his house. Evans told Mitchell that, due to a recent change in Kansas law, Chapman could not deny the officers permission to search if the officers possessed reasonable suspicion that he had committed a crime. Evans told Mitchell that he would call Chapman.

Evans telephoned Chapman, who by this time had shut the front door and gone back inside of his house. Evans told Chapman about the recent change in the law and explained that if the officers had reasonable suspicion of criminal activity, he needed to allow them to search his house. Following the phone call, Chapman came outside and reluctantly told the officers that, based on the information Evans had provided to him, they could enter his house and conduct a search.

During their search of the house, the officers found an open laptop computer and a laser printer in Chapman's bedroom. On the laptop, there was an icon for Versa Check—a software program for making checks. The officers also found check stock paper in the same bedroom. In the kitchen/dining area, officers found a desktop computer that also had an icon for Versa Check. Bieberle searched Chapman's basement but initially was unable to find the basket Arnold said would be located beside the pool table. When Bieberle inquired about the basket, Chapman walked to a basement storage room and pointed to a basket on a shelf. Inside the basket, Bieberle found many items, including checks, personal documents, and IDs belonging to several people other than Chapman or Arnold. The officers completed their search and seized evidence from Chapman's residence relevant to their investigation of identity theft.

5

Chapman met with Evans at the parole office the day after the search. During this meeting, Evans requested that Chapman sign a written agreement acknowledging that he was subject to search by police officers based on reasonable suspicion of a parole violation or criminal activity. This meeting marked the first occasion in which Chapman acknowledged in writing the new conditions of his parole. When Evans asked Chapman about the previous day's events, Chapman denied any wrongdoing.

The State ultimately charged Chapman with two counts of identity theft and two counts of theft after prior conviction. Before trial, Chapman filed a motion to suppress all evidence seized during the search of his house. In the motion, Chapman claimed the search was unlawful because his consent was coerced. The State filed a response arguing that the search was authorized by K.S.A. 2012 Supp. 22-3717(k)(3).

The district court held an evidentiary hearing on Chapman's motion to suppress. The State called Mitchell, Evans, and Bieberle as witnesses, while the defense called Chapman. After hearing the evidence, the district court denied Chapman's motion. The district court did not address Chapman's consent argument but ruled that the search was valid under K.S.A. 2012 Supp. 22-3717(k)(3).

Chapman's case proceeded to a jury trial. The State called Hay, Mitchell, Evans, and Bieberle as witnesses, as well as five persons whose checks, IDs, or other personal documents were found in Chapman's house. Chapman objected at trial to the introduction of evidence seized during the search of his house. Chapman testified in his own defense. He claimed that several days before the search of his house, Arnold came to his house and asked if he could store some items there, including the laser printer found in Chapman's bedroom and the basket found in the basement. Chapman denied creating any of the checks or fake IDs found in his house and said that he never examined the contents of the basket Arnold left there.

The jury found Chapman guilty as charged. The district court imposed a controlling sentence of 18 months' imprisonment, followed by 12 months' postrelease supervision. Chapman timely appealed the district court's judgment.

Chapman's first issue on appeal is whether the district court erred in denying his motion to suppress evidence seized during the search of his house. Chapman's argument is three-pronged. First, he contends that his grant of consent to search was invalid because his parole officer told him he had no choice in the matter. Second, he asserts that the police failed to comply with the requirements of K.S.A. 2012 Supp. 22-3717(k)(3) when they conducted a search without Chapman's written agreement. Finally, Chapman claims the police did not possess reasonable suspicion to believe that he was committing a crime. The State responds that the district court did not err in denying Chapman's motion to suppress because the search was conducted with Chapman's consent and pursuant to express statutory authority.

In reviewing the granting or denial of a motion to suppress evidence, the appellate court determines whether the factual findings underlying the district court's suppression decision are supported by substantial competent evidence. The appellate courts do not reweigh the evidence or reassess the credibility of witnesses. The ultimate legal conclusion drawn from those factual findings is reviewed under a de novo standard. *State v. Carlton*, 297 Kan. 642, 645, 304 P.3d 323 (2013).

*Did the police comply with the requirements of K.S.A. 2012 Supp. 22-3717(k)(3)?*

The district court denied Chapman's motion to suppress and found that the search of his house was valid under K.S.A. 2012 Supp. 22-3717(k)(3). Thus, the first step in analyzing whether the district court erred in denying the motion to suppress is to address the question of whether the police did, in fact, comply with the statutory requirements for the search. Chapman argues that the police did not comply with the requirements of

K.S.A. 2012 Supp. 22-3717(k)(3) because he had not yet agreed in writing to the new condition of his parole when the officers appeared at his door to search his residence.

Under the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights, individuals have the right to be free from unreasonable governmental searches and seizures. *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007). Special deference is given to the privacy of a person's home. *State v. Reno*, 260 Kan. 117, 128, 918 P.2d 1235 (1996). Generally, the State must have a warrant based on probable cause to search a person's home. See *Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980) (a warrantless search of a home is per se unreasonable). However, the warrantless search of a person's home may, under some circumstances, be deemed reasonable. See *Thompson*, 284 Kan. at 776 (listing several exceptions recognized in Kansas).

One such circumstance exists when the home being searched belongs to a parolee. Parolees have a greatly diminished expectation of privacy, even in their homes, particularly when the parolee has been informed that he or she may be subject to searches as a condition of release. Thus, the government's intrusion on a parolee's privacy may be supported by a diminished level of suspicion. See *State v. Haffner*, 42 Kan. App. 2d 205, 208-09, 209 P.3d 734 (2009), *rev. denied* 290 Kan. 1098 (2010).

Before K.S.A. 22-3717 was amended in 2012, the Kansas Legislature had not authorized suspicionless searches of parolees. See *State v. Bennett*, 288 Kan. 86, 98, 200 P.3d 455 (2009). Under the amended statute, parolees shall agree in writing to be subject to search or seizure by a parole officer or a department of corrections officer at any time, with or without a search warrant and with or without cause. See K.S.A. 2012 Supp. 22-3717(k)(2). However, reasonable suspicion of a parole violation or criminal activity is still required if the search is conducted by a law enforcement officer other than a parole officer or a department of corrections officer.  K.S.A. 2012 Supp. 22-3717(k)(3) states:

8

"Parolees and persons on postrelease supervision are, *and shall agree in writing to be*, subject to search or seizure by any law enforcement officer based on reasonable suspicion of the person violating conditions of parole or postrelease supervision or reasonable suspicion of criminal activity. Any law enforcement officer who conducts such a search shall submit a written report to the appropriate parole officer no later than the close of the next business day after such search. The written report shall include the facts leading to such search, the scope of such search and any findings resulting from such search." (Emphasis added.)

At the hearing on the motion to suppress, Evans testified that upon learning of the 2012 statutory amendment, personnel at the state parole office devised a method by which to satisfy the statute's requirement of a written agreement by the parolee. Evans testified that, in order to ensure compliance with the statute, "we [the parole officers] were going to impose a special condition with the wording from the statute with each offender as we met with them." According to Evans, the updated copy of the parole conditions would include a new "wording" advising parolees that they were subject to searches by law enforcement officers based upon reasonable suspicion of a parole violation or criminal activity.

Though Evans had met with Chapman sometime in July 2012, Evans had not yet presented a copy of the updated parole conditions to Chapman at the time the police came to his house on August 1, 2012. Evans testified that when he called Chapman that day, "[he] recognized that the paperwork had not been taken care of, so [he] made it a point to explain to Mr. Chapman of what the law change actually did in terms of the impact that it was going to have in this particular situation." Evans met with Chapman on August 2 and presented to Chapman for his signature the modified conditions of parole. Chapman signed the modified conditions of parole that day.

In denying the motion to suppress, the district judge specifically addressed the "shall agree in writing" requirement in K.S.A. 2012 Supp. 22-3717(k)(3):

9

"Reading of the statute, deleting the language about 'and shall agree in writing' to mean. Then reads, parolees and persons on postrelease supervision are subject to search or seizure by any law enforcement officer based on reasonable suspicion. . . . To make that authority contingent upon a written agreement by the parolee, I think would nullify the intent of the statute. If the parolee never signed such an agreement, [the parolee] could never be subject to search, either by the parole officer or by law enforcement of the circumstances.

"I think that is more of a procedural suggestion to allow the process to be smoother, to allow fewer arguments, fewer issues raised post-search. The bottom line is, I think, the intent, regardless of the 'shall agree in writing' to mean, the bottom line is paroless and persons on postrelease supervision are subject to search or seizure by any law enforcement officer based on reasonable suspicion.

. . . .

"Quite honestly, ignorance of the provision of the law, as it might relate to law enforcement, does not relieve Mr. Chapman from not having to be subject to that law. Again, the lack of a written agreement does not nullify. The lack of written agreement did not nullify the search."

Chapman now contends that because he had not yet executed an agreement to the new condition of his parole allowing any law enforcement officer to search his property based on reasonable suspicion, the search of his house was improper. The State asserts that nothing in the language of K.S.A. 2012 Supp. 22-3717(k)(3) indicates that the authority to search a parolee is contingent upon the parolee's written approval.

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12 (2014). The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State v. Williams*, 298 Kan. 1075, 1079, 319 P.3d 528 (2014). An appellate court must first attempt to ascertain the legislative intent through the statutory language enacted, giving common words their ordinary meanings. *State v. Phillips*, 299 Kan. 479, 495, 325 P.3d 1095 (2014).

10

When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *State v. Brooks*, 298 Kan. 672, 685, 317 P.3d 54 (2014). Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the legislature's intent. *Phillips*, 299 Kan. at 495.

The State points to *State v. Anderson*, 40 Kan. App. 2d 69, 188 P.3d 38 (2008), *rev. denied* 287 Kan. 766 (2009), to support its argument that the police officers' authority to search Chapman's house was not contingent upon his written agreement to the new conditions of his parole. In that case, Anderson was charged with violating the Kansas Offender Registration Act (KORA) because he failed to report to his local sheriff during the month of his birthday as required by K.S.A. 2006 Supp. 22-4904(d). The statute also required that the sheriff explain the registration procedure and then have each registrant sign an acknowledgment form. See K.S.A. 2006 Supp. 22-4904(a)(5). But when Anderson registered with the local sheriff, he did not have him sign the acknowledgment and allegedly did not explain that he had to report during the month of his birthday. The district court found that the sheriff's office had not provided Anderson with appropriate information and dismissed the criminal charge against him for failing to report.

On appeal, this court reversed the district court's judgment, finding that K.S.A. 2006 Supp. 22-4904(a)(5) "[did] not even hint that a sheriff's duties to explain the registration process could be linked to the registrant's potential criminal liability for violating the Act." 40 Kan. App. 2d at 70. Consequently, this court found that the sheriff's failure to present Anderson with an acknowledgment and obtain his signature did not excuse Anderson's failure to report. 40 Kan. App. 2d at 70-71.

11

On its surface, this court's decision in *Anderson* seems to support the State's contention that the lack of Chapman's prior written agreement to his new parole conditions did not invalidate the search. However, we distinguish *Anderson* from Chapman's case for two reasons. The first reason involves the structure of the applicable statutes. Anderson was charged with violating K.S.A. 2006 Supp. 22-4904(d) for failing to report during the month of his birthday. The statutory requirement for the sheriff to explain the registration procedure to each registrant was found in a different subsection of the statute, K.S.A. 2006 Supp. 22-4904(a)(5).

The fact that the sheriff's duties to explain the registration process and Anderson's requirement to report during the month of his birthday were contained in different subsections of the statute factored into this court's conclusion that the sheriff's duties to explain the registration process could not be linked to Anderson's criminal liability for violating the Act. See 40 Kan. App. 2d at 70. Here, the requirement that a parolee "shall agree in writing" to a search by law enforcement officers based on reasonable suspicion is set forth in one sentence in K.S.A. 2012 Supp. 22-3717(k)(3). In other words, based upon the statutory language and structure, there is a definite link between the parolee's written agreement and the authority for the search as set forth in K.S.A. 2012 Supp. 22-3717(k)(3) that is not found in the KORA statute analyzed by this court in *Anderson*.

A second and even more important distinction is that, as the concurring opinion in *Anderson* noted, K.S.A. 2006 Supp. 22-4904(a)(5) required the sheriff to notify the offender of his or her duty to *register* under KORA, but nothing in the statute required the sheriff to notify the offender of the specific duty to *report* under the Act. See 40 Kan. App. 2d at 73 (Greene, J., concurring). Thus, there simply was no statutory obligation for the sheriff to explain to Anderson that he was required to report during the month of his birthday. See 40 Kan. App. 2d at 73. For this reason, we conclude that *Anderson* is not on point and does not support the State's contention that Chapman was not required to agree in writing to his new conditions of parole.

12

In upholding law enforcement officers' searches of parolees' persons or property, the United States Supreme Court has placed great emphasis on a parolee's knowledge of the conditions of his or her parole. For instance, in *Samson v. California*, 547 U.S. 843, 850-57, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006), a law enforcement officer searched Samson for no reason other than the fact that he was a known parolee. Samson's parole agreement stated that he was subject to search or seizure at any time by a parole or other peace officer, with or without a search warrant or probable cause. The Court upheld the search after balancing Samson's privacy rights with the needs of California to supervise its parolees. It found significant the fact that Samson had signed an acknowledgement of the conditions of his parole, citing *United States v. Knights*, 534 U.S. 112, 119-20, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001):

> "[A]s we found 'salient' in *Knights* with respect to the probation search condition, the parole search condition under California law—requiring inmates who opt for parole to submit to suspicionless searches by a parole officer or other peace officer 'at any time,' [citation omitted]—was 'clearly expressed' to petitioner. *Knights*, 534 U.S., at 119. He signed an order submitting to the condition and thus was 'unambiguously' aware of it. [534 U.S. at 119.] In *Knights*, we found that acceptance of a clear and unambiguous search condition 'significantly diminished Knights' reasonable expectation of privacy.' [534 U.S. at 120.] Examining the totality of the circumstances pertaining to petitioner's status as a parolee, 'an established variation on imprisonment,' [citation omitted], including the plain terms of the parole search condition, we conclude that petitioner did not have an expectation of privacy that society would recognize as legitimate." *Samson*, 547 U.S. at 852.

This court considered both the *Knights* and *Samson* opinions in *State v. Uhlig*, 38 Kan. App. 2d 610, 170 P.3d 894 (2007), *rev. denied* 286 Kan. 1185 (2008), in which this court upheld a warrantless search of a probationer's bedroom. A condition of Uhlig's probation required him to submit to searches as directed by his court services officer (CSO). Pursuant to that condition, a CSO made a random visit to Uhlig's home to ensure his compliance with the terms and conditions of probation. Uhlig admitted to the CSO

that he delayed opening the door because he had been trying to hide his cigarettes. Possession of tobacco was a violation of Uhlig's probation. The CSO searched Uhlig's bedroom and found some ecstasy pills.

On appeal, this court found that Uhlig's attempt to hide his cigarettes was an undeniable violation of his probation, which gave the CSO reasonable suspicion to search his room. The court pointed out that "Uhlig was aware of the terms and conditions of his probation since they were written in plain language." 38 Kan. App. 2d at 616. Balancing the State's need to supervise its probationers with Uhlig's diminished expectation of privacy due to his status as a probationer, this court upheld the district court's denial of Uhlig's motion to suppress. 38 Kan. App. 2d at 617.

Two years later in *Haffner*, 42 Kan. App. 2d at 210-14, this court once again emphasized a parolee's knowledge of the relevant condition of his parole when it upheld a warrantless search of his house. When Haffner was paroled, he signed an acknowledgment form verifying that he had been informed of the conditions of his release. One of the conditions was that a special enforcement officer (SEO) could conduct a search of a parolee's person or property if suspicion existed that the parolee had violated the conditions of his or her release. Haffner's parole officer received word that one of his UAs tested positive for methamphetamine. The officer also received an anonymous tip indicating that Haffner might be manufacturing methamphetamine in his home. At the parole officer's request, an SEO and several other officers conducted a parole search of Haffner's house.

In upholding the search, this court reiterated that "[p]arolees have a greatly diminished expectation of privacy, even in their homes, particularly when the parolee has been informed that he or she may be subject to property searches as a condition of release." 42 Kan. App. 2d 205, Syl ¶ 1. This court found that Haffner's positive UA and the anonymous tip to law enforcement were sufficient to establish reasonable suspicion of

a parole violation, which was all that was required to search Haffner's house. 42 Kan. App. 2d at 213-14.

In each of these cases upholding a search based on reasonable suspicion, the court placed great emphasis on the subject's knowledge of the conditions of his parole or probation and the fact that the subject had signed a written acknowledgement of the conditions of his release. Here, it is undisputed that Chapman was not informed of the new conditions of his parole imposed by K.S.A. 2012 Supp. 22-3717(k)(3) until police officers were at his house waiting to search. While Chapman was told by Evans over the telephone of the new conditions of his parole, he did not agree in writing to be subject to a search by law enforcement officers based on reasonable suspicion until the next day.

K.S.A. 2012 Supp. 22-3717(k)(3) provides that a parolee "shall agree in writing" to be subject to search or seizure by law enforcement officers based on reasonable suspicion. Based on the plain and unambiguous language of the statute, we find that a parolee's written agreement is, in fact, a condition for a law enforcement officer's search of a parolee's home based on reasonable suspicion. If a parolee's written agreement is not required before law enforcement may conduct a search of a parolee pursuant to K.S.A. 2012 Supp. 22-3717(k)(3), this language would be rendered meaningless.

The State argues that under Chapman's interpretation of K.S.A. 2012 Supp. 22-3717(k)(3), "any parolee could avoid application of the statute by failing to sign the paperwork." But this argument overlooks the obvious fact that if a prison inmate refuses to sign the written conditions of his or her parole, the inmate will not be released on parole in the first place. In this case, Evans acknowledged that he had an opportunity to require Chapman to sign a new parole agreement prior to the search of Chapman's house on August 1, 2012, but he simply did not get around to completing the task.

15

For all these reasons, we conclude that the police did not comply with the requirements of K.S.A. 2012 Supp. 22-3717(k)(3) prior to the search of Chapman's house. Thus, the district court erred by denying Chapman's motion to suppress based solely on its finding that the search was valid under K.S.A. 2012 Supp. 22-3717(k)(3).

*Was Chapman's grant of consent to search valid?*

The State contends that it does not matter whether the police complied with the requirements of K.S.A. 2012 Supp. 22-3717(k)(3) because Chapman ultimately consented to the search of his home after being accurately informed of the law. But Chapman argues that his consent to the search was coerced because his parole officer had told him he had no choice in the matter.

Any warrantless search is per se unreasonable unless it falls within one of the exceptions to the search warrant requirement recognized in Kansas. *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014). Consent is such an exception to the warrant requirement. *State v. Johnson*, 253 Kan. 356, 362, 856 P.2d 134 (1993). "'For a consent to search to be valid, two conditions must be met: (1) There must be clear and positive testimony that consent was unequivocal, specific, and freely given and (2) the consent must have been given without duress or coercion, express or implied.' [Citations omitted.]" *State v. Ransom*, 289 Kan. 373, 381, 212 P.3d 203 (2009).

The State has the burden of establishing the scope and voluntariness of the consent to search. These questions present issues of fact which appellate courts review to determine if substantial competent evidence supports the district court's findings. 289 Kan. at 380. If the parties do not dispute the material facts, the suppression issue is solely a question of law. *State v. Spagnola*, 295 Kan. 1098, 1104, 289 P.3d 68 (2012).

16

Here, the parties agree on the facts leading up to Chapman's grant of consent. When the officers arrived at Chapman's house, they knocked and Chapman answered the door. Bieberle identified himself and told Chapman he was there to investigate financial crimes. Bieberle asked if the officers could come in and search the residence, but Chapman refused. Bieberle was very persistent and continued trying to convince Chapman to consent to a search, but Chapman declined. Chapman told Bieberle that he was not coming in without a search warrant and went back inside his house. By all accounts, it was not until after Chapman received Evans' phone call that he allowed the officers to search. After speaking with Evans, Chapman opened the front door, walked out, and "unhappily" said something to the effect of, "Come on in. I guess, I'm going to let you search." Bieberle estimated that 45 minutes passed between his arrival and the point at which he actually entered Chapman's house.

In *City of Kingman v. Lubbers*, 31 Kan. App. 2d 426, 428-29, 65 P.3d 1075, *rev. denied* 276 Kan. 967 (2003), this court ruled that a driver's consent to a preliminary breath test was not rendered invalid when the officer truthfully and accurately informed the driver of the legal consequences of refusing to consent. Here, the State argues that Chapman consented to the search of his home "after being accurately informed of the law." But as we discussed in the prior section of this opinion, Chapman was not accurately informed of the law. Evans never explained to Chapman that K.S.A. 2012 Supp. 22-3717(k)(3) required Chapman to agree in writing to a search by law enforcement officers based on reasonable suspicion. As a result, Chapman's consent was based on Evans' erroneous representation of the law and was not knowingly given.

Based upon the undisputed facts, the State has failed to meet its burden that Chapman's consent to the search was unequivocal, specific, and freely given without duress or coercion, express or implied. See *Ransom*, 289 Kan. at 380-81. Rather, it is obvious that Chapman only reluctantly agreed to the search of his house after being informed by Evans that he had no choice in the matter.

17

Chapman also argues that the officers did not have reasonable suspicion to conduct a search. On this point we disagree with Chapman. Based on the totality of the circumstances and the information that had been provided to law enforcement that evidence of identity theft could be found in Chapman's house, the police had reasonable suspicion to search the residence. However, for the reasons we have discussed, the requirements of K.S.A. 2012 Supp. 22-3717(k)(3) were not satisfied in this case because Chapman had not been required or requested to agree in writing to the new conditions of his parole prior to the search. Moreover, Chapman's verbal consent to the search of his home was not freely and voluntarily given under the circumstances. For these reasons, we conclude the district court erred in denying Chapman's motion to suppress the evidence seized during the search of his house. We reverse Chapman's convictions and remand with directions to grant his motion to suppress. Based on our resolution of this issue, we do not need to reach the other issues Chapman has raised on appeal.

Reversed and remanded with directions.