**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 3, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SHANNON LEE BLAKE,

Defendant-Appellant.

No. 07-8050
(D. Wyoming)
(D.C. No. 06-CR-224-1-B)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, Chief Judge, **TYMKOVICH**, and **O'BRIEN**, Circuit Judges.

Shannon Blake was convicted after a jury trial of (1) conspiracy to possess with intent to distribute more than 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846; and (2) possession with intent to distribute more than 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Mr. Blake had a prior felony drug conviction, and, as a

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

result, the government sought an enhanced sentence. The district court applied the enhancement and sentenced Mr. Blake to 240 months' imprisonment.

The government's prosecution of Mr. Blake arose out of the February 24, 2006 search of the residence that he shared with his wife Donna Blake in Casper, Wyoming. At that time, Ms. Blake was on probation for three separate felony bogus check convictions in Wyoming state court. Under the terms of her probation agreements, Ms. Blake was subject to urinalysis testing, and her residence could be searched upon a showing of reasonable cause. After Ms. Blake tested positive for methamphetamine, a probation officer and agents from the Wyoming Division of Criminal Investigation conducted the search and discovered methamphetamine packaged in approximately thirty gram-sized baggies, a safe containing $6,850, digital scales, packaging materials, cell phones, and a notebook containing records of drug transactions.

In this appeal, Mr. Blake now argues that: (1) the search of the Blakes' residence violated his Fourth Amendment rights because its purpose was not to ensure compliance with Ms. Blake's probation agreement but rather to aid state law enforcement agents in the detection of crime; and (2) the district court erred in three evidentiary rulings at trial.

We are not persuaded by Mr. Blake's Fourth Amendment argument. As to the district court's evidentiary rulings, we conclude that the trial court did err in allowing a Wyoming Department of Criminal Investigation agent to give expert

-2-

testimony without first finding the testimony relevant and reliable under Federal Rule of Evidence 702. Nevertheless, in light of the other evidence presented by the government, that error was harmless. Additionally, Mr. Blake's other evidentiary challenges are not supported by the record and the applicable law. We therefore affirm his convictions and sentence.

## I. BACKGROUND

### A. The Search of the Blakes' residence

In February 2006, Ms. Blake submitted to a urinalysis that indicated that she had taken methamphetamine. At that time, Ms. Blake was on probation for three bogus check convictions in Wyoming state court. The probation agreements in those cases provided that

> . . . I will allow my Probation/Parole Agent to visit me in my home, my employment site, or elsewhere.
> . . . I will submit my person, property, place of residence, vehicle, and personal effects to search and seizure at any time, with or without a search warrant, whenever **reasonable cause** is determined by a Probation/Parole Agent.
> . . . I shall permit the extraction of bodily fluid, to include urinalysis, for blood alcohol and drug screening.

Aple's Br. attach (gov. ex. 3) (emphasis added).

Upon learning of the positive test, Jennifer Miner, an agent of the Wyoming Probation and Parole Department, contacted Agent Kevin Norcross of the Wyoming Division of Criminal Investigation [DCI] to advise him of the result.

-3-

Probation Agent Miner asked DCI Agent Norcross if he had any information about Ms. Blake or her husband. Agent Norcross informed her that the DCI had discovered evidence that Mr. Blake had been distributing methamphetamine. Agent Miner told Agent Norcross that, because of the positive urinalysis, probation officers would be conducting a home visit and a search of the Blakes' Casper, Wyoming, residence. She requested that DCI agents assist in the search.

On February 24, 2006, at approximately 8:00 a.m., probation and DCI agents arrived at the Blakes' residence to conduct the search. Mr. Blake was outside the house, and he spoke with DCI agent Scott Weischedel. He told Agent Weischedel that his wife had gone to the store. Probation Agent Miner then asked Mr. Blake if the agents could check inside the house for Ms. Blake, and Mr. Blake let the agents in the front door. Mr. Blake followed them in and proceeded to the door of a bedroom. When Mr. Blake opened the bedroom door, the agents realized that Ms. Blake was sleeping there. Mr. Blake told his wife to wake up because the probation agents wanted to speak with her. Probation Officer Miner then advised Ms. Blake of the positive urinalysis and told her that the agents were going to search the house. Neither of the Blakes expressed any objections.

The search began in the bedroom where Ms. Blake had been sleeping. In plain view on a dresser, the agents saw baggies suspected to contain methamphetamine. Six of the baggies had the words "To Sell" written across them. The agents also found a small floral print bag with the word "personal"

written on it.  Inside the bag, the agents discovered thirty baggies, as well as syringes and spoons.  They also observed a substance in the baggies that they suspected to be methamphetamine.  In the Blakes' bedroom, the agents also found other evidence indicative of drug trafficking: digital scales, packaging materials, and pay/owe sheets.

The bedroom contained live television monitors showing camera views of the front and back of the house.  On the south wall, the agents found a safe.  Upon the agents' request, Mr. Blake opened it, and the agents discovered $6,850 in cash along with various coin collections.

### B.  Mr. Blake's Motion to Suppress

In September 2006, a federal grand jury charged Mr. Blake with (1) conspiracy with intent to distribute more than 500 grams of methamphetamine, a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), and 846; and (2) possessing with intent to distribute more than 500 grams of methamphetamine, a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).  The indictment also charged Ms. Blake and Darrin Brown with the conspiracy offense.

Prior to trial, Mr. Blake moved to suppress the evidence discovered during the February 24, 2006 search.  He asserted that the government should have obtained a search warrant before entering the residence.

After conducting an evidentiary hearing, the district court denied the motion. The court reasoned:

> [Ms.] Blake was on probation. Part of her probation agreement was that she would submit to home visits and searches of her residence by a probation officer if there was a reasonable suspicion to believe that [Ms.] Blake was in possession of contraband at her residence. In this case, the first cause for reasonable suspicion was that [Ms.] Blake failed her drug test. The second cause for reasonable suspicion was that Agent Norcross had information indicating that both [Ms. and Mr.] Blake were involved in drug activity. Therefore, this Court finds that these grounds are more than enough for reasonable suspicion. The reasonable suspicion coupled with the signed parole agreement justifies the Government in its warrantless search.

Rec. vol. I, doc. 79, at 5.

The district court also concluded that "sufficient consent existed to search the Blake residence." Id. at 6. Ms. Blake had provided valid consent by signing the probation agreement. Also, the court reasoned, Mr. Blake had let the officers in and had not clearly expressed an objection to the search.

Finally, the district court rejected Mr. Blake's argument that the officers lacked the articulable suspicion necessary to conduct a protective sweep of the house. In light of Ms. Blake's probation agreement and the positive urinalysis, no further justification of a protective sweep was necessary.

### C. The Evidence At Trial

At trial, DCI Agent Norcross testified that in addition to the actual methamphetamine found at the Blakes' home, more than 350 empty and unused

plastic baggies were located in a closet of the Blakes' bedroom. He also told the jury that multiple scales capable of weighing gram quantities of methamphetamine were located in the bedroom, and he informed them of the $6,850 in cash that was recovered from the safe in the bedroom.

The government also offered testimony indicating that the Blakes had sold methamphetamine. Darrin Brown, who was charged with the same conspiracy and who pleaded guilty before Mr. Blake's trial, testified that, upon his release from prison in late 2005, he returned to Casper, Wyoming, and began to acquire methamphetamine from Mr. Blake for redistribution. Mr. Brown also said that he had taken two trips to Phoenix with Mr. Blake for the purpose of acquiring methamphetamine for redistribution. On the first trip, Mr. Brown said that he had been paid $200 for driving Mr. Blake to Phoenix. On the second trip, Mr. Blake told him that he had acquired approximately fourteen ounces of methamphetamine. Mr. Brown said that he had received an ounce of the drug as payment for having made the trip.

Tammy Camblin, Warren Turner, and Byron Burke also testified that Mr. Blake had distributed methamphetamine. Ms. Camblin stated that she had sold two pickup trucks to Mr. Blake in exchange for three to five grams and seven grams of the drug. Mr. Turner reported that in 2005 and 2006, he acquired methamphetamine from an employee named Adam Monchones. Mr. Monchones told Mr. Turner that he obtained the methamphetamine from Mr. Blake. On one

occasion, Mr. Turner and Mr. Monchones paid $2,000 to Mr. Blake for an ounce of the drug. Finally, Mr. Burke testified that he accompanied another man, Darrell Smith, to the Blakes' home, where Mr. Blake produced four ounces of methamphetamine from a safe in the bedroom and sold it to Mr. Smith for $2,500.

Additionally, DCI Agent Scott Weischedel testified as to Mr. Blake's admissions on the day of the search. According to Agent Weischedel, Mr. Blake acknowledged that he and his wife had used methamphetamine at their residence. He also admitted that he and Ms. Blake had traveled to Phoenix, Arizona, on two occasions within the previous twelve weeks in order to purchase methamphetamine. On the first occasion, they took $3,200, and on the second occasion, they spent $4,000 on the drug. In the interview, Mr. Blake denied that he and his wife had brought back pounds of methamphetamine for resale. However, Agent Weischedel reported, Mr. Blake did admit that the two of them began selling gram and half-gram quantities.

Agent Weischedel added that Mr. Blake changed his story during the latter stages of this first interview. Mr. Blake said that he did not want to get his wife in trouble. He explained that he had not sold methamphetamine since he had stopped using it approximately four years ago and that he had been trying to get his wife to stop using the drug as well.

DCI Agents Weischedel and Norcross interviewed Mr. Blake again on May 30 and May 31, 2006, when he was in custody. During that interview, Mr. Blake

admitted to paying $3,000 to settle a methamphetamine debt of Ms. Blake, arranging two methamphetamine transactions (for two grams and for one ounce) with his friend James Schafer, buying an eighth of an ounce of methamphetamine from Armour Jolley, and giving Mr. Jolley a couple of bags as part payment for the sale of a van. Mr. Blake further reported that his wife had sold ounces of methamphetamine to a girl named Tammy near Wright, Wyoming.

In the course of these interviews, Agent Weischedel reported, Mr. Blake said that he had made at least three trips to Arizona in order to purchase methamphetamine. During these trips, Mr. Blake admitted, he had exchanged money for methamphetamine, and he had delivered a half-ounce of methamphetamine to Adam Monchones.

Finally, Mr. Blake testified in his defense. He asserted that many of the statements that he had made during these interviews with the DCI agents were not true. He maintained that he had made some of these statements in order to protect his wife from prosecution.

The jury convicted Mr. Blake on both the conspiracy and distribution counts. The government sought an enhanced sentence under 21 U.S.C. §§ 841(b)(1)(A) and 851 because Mr. Blake had been previously convicted of a felony drug offense. The court sentenced him to twenty years' imprisonment, the mandatory minimum.

## II. DISCUSSION

On appeal, Mr. Blake argues that the district court erred in denying his motion to suppress. He also argues that the court erred in three evidentiary rulings by allowing DCI Agent Norcross to give opinion testimony about various practices used by drug dealers; admitting an out-of-court statement by Ms. Blake that the money in a safe came from the sale of electronics equipment; and admitting the plea agreements of two government witnesses. We consider each argument in turn.

### A. Denial of Motion to Suppress

Mr. Blake first argues that the purpose of the search of his residence was to aid the DCI agents in investigating a suspected drug trafficking crime rather than to ensure compliance with his wife's probation agreement. He thus characterizes the search as a subterfuge for criminal investigation. In his view, even though Ms. Blake's probation agreement authorized a search of their residence upon "reasonable cause," it did not allow the kind of search that occurred here–one by law enforcement agents who were not responsible for enforcing the probation agreement. As a result, he contends, the search was unreasonable under the Fourth Amendment.

Mr. Blake also argues that the search of his residence is invalid under the reasoning of the Supreme Court in Georgia v. Randolph, 547 U.S. 103 (2006).

There, the Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." Id. at 120. Here, although he did not expressly object to the search, Mr. Blake notes that he "was not given the opportunity to consent or object[,] as the search was going to happen anyway." Aplt's Br. at 17.

### 1. Standard of Review

In reviewing a denial of a motion to suppress, we consider the evidence in the light most favorable to the government (as the prevailing party) and accept the district court's factual findings unless clearly erroneous. United States v. Worthon, 520 F.3d 1173, 1178 (10th Cir. 2008). A finding is clearly erroneous when it is "without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." United States v. Cernobyl, 255 F.3d 1215, 1221 (10th Cir. 2001) (internal quotations omitted). The ultimate question of the reasonableness of a search, however, is reviewed de novo. Worthon, 520 F.3d at 1178.

### 2. Probationary searches

The Supreme Court has concluded that "probationers and parolees do not enjoy the full suite of rights provided by the Fourth Amendment." See United States v. Trujillo, 404 F.3d 1238, 1241-42 (10th Cir. 2005) (discussing Griffin v. Wisconsin, 483 U.S. 868 (1987) and United States v. Knights, 534 U.S. 112

-11-

(2001)).  In <u>Griffin</u>, the Court upheld a search conducted pursuant to a Wisconsin regulation permitting the warrantless search of a probationer's home as long as there were "reasonable grounds" to believe that contraband was present there. 483 U.S. at 872-73.  The Court reasoned that "the special needs of Wisconsin's probation system make the warrant requirement impracticable and justify replacement of the standard of probable cause by reasonable grounds."  <u>Id.</u> at 876 (internal quotation marks omitted).  Because the search was conducted pursuant to a valid regulation, it comported with the Fourth Amendment.  In <u>Knights</u>, the Court rejected the view that a search conducted pursuant to a probation order could only be reasonable if it was conducted for "probationary" rather than "investigatory" purposes.  534 U.S. at 116.   Accordingly, the warrantless search of a probationer's residence, supported by reasonable suspicion and authorized by the probation agreement, comported with the Fourth Amendment.  <u>Id.</u> at 122.

In <u>United States v. Tucker</u>, 305 F.3d 1193 (10th Cir. 2002), this court applied <u>Knights</u> to a parole search.[1]   The defendant there argued that a parole search was merely a subterfuge for law enforcement purposes and thus not in compliance with the Utah law requirement that the search be conducted for parole

---

[1]  Even though <u>Griffin</u> and <u>Knights</u> concerned probation searches and <u>Tucker</u> involved a parole search, "[t]he difference between a warrantless search pursuant to a probation agreement . . . and a warrantless search pursuant to a parole agreement, . . .  is immaterial for purposes of Fourth Amendment analysis." <u>Trujillo</u>, 404 F.3d at 1241 n.1.

purposes. We responded that one of the requirements of the defendant's parole was that he obey all federal, state, and municipal laws. Id. at 1200. Because the search was supported by reasonable suspicion that the defendant had violated the law, the search complied with the parole agreement search provision, which made the case "materially indistinguishable from Knights." Id.

Here, the district court's denial of Mr. Blake's motion to suppress is supported by these decisions. As in Griffin, Knights, and Tucker, the search was conducted pursuant to a valid exercise of the state's authority over probationers. The agreement signed by Mrs. Blake provided for searches upon reasonable suspicion. Moreover, as the district court concluded and Mr. Blake has not disputed, Ms. Blake's positive urinalysis, combined with the information received by DCI agents indicating the Blakes were involved in drug trafficking, was sufficient to establish reasonable suspicion.

Additionally, contrary to Mr. Blake's contention, the fact that DCI agents assisted probation officers in conducting the search does not render the search unreasonable. The probation agreement at issue here did not preclude such assistance: it merely stated that "whenever reasonable cause is determined by a Probation/Parole Agent," Ms. Blake would "submit [her] person, property, place of residence, vehicle and personal effects to search and seizure at any time, with or without a search warrant." Aple's Br. attach (gov. ex. 3). Moreover, there is

-13-

no dispute that the probation officer rather than the DCI agents made the initial determination of reasonable suspicion and decided to conduct the search.

We further note that the Eighth Circuit has rejected an argument similar to Mr. Blake's. In United States v. Brown, 346 F.3d 808 (8th Cir. 2003), the defendant contended that a search conducted pursuant to a probation agreement "was no more than a ruse for a police investigation," id. at 810 (citation omitted), and he pointed to the fact that agents from a drug task force assisted with the search. In concluding that the search was reasonable, the Eighth Circuit applied Knights, "balanc[ing] any additional privacy intrusion resulting from the presence of the additional personnel against the legitimate interests advanced by their presence." Id. at 812. It reasoned that "[p]robation offices are neither designed nor staffed to conduct these types of searches alone[,]" id. (citing David N. Adair, Jr., Probation Officer Searches, 62 FED. PROBATION 68 (June 1998) (other citation omitted), and that "[p]robation officers often must bring law enforcement along to ensure the probation officers' safety." Id. Therefore, the government interest in ensuring the safety of the probation officer "outweigh[ed] any marginal, additional intrusion into [the defendant's] privacy resulting from the task force agents' presence." Id. (concluding that "when a probationary condition authorizes searches by probation officers, the Fourth Amendment does not require probation officers to choose between endangering themselves by searching alone

-14-

and foregoing the search because they lacked the resources and expertise necessary to search alone safely"). We agree.

Mr. Blake's reliance on our decision in United States v. Freeman, 479 F.3d 743 (10th Cir. 2007), is also not persuasive. There, a policy of the Kansas Department of Corrections provided that, with certain exceptions not applicable to the facts, only certain parole officers were authorized to conduct searches of parolees' residences. The policy also provided that searches must be supported by reasonable suspicion of a violation of probation conditions. The defendant had signed a parole agreement stating that he agreed to a search of his residence. 479 F.3d at 744-45.

In holding that the search was unreasonable, we relied on two factors: (1) the search was conducted by ordinary officers from the Wichita Police Department, and no parole officer instructed the police officers to conduct the search or came to the defendant's residence at the time of the search; and (2) the search was not supported by reasonable suspicion. See id. at 749-50 (stating that "we cannot agree with the district court that the officers had reasonable suspicion to search [the defendant's] home without consent, without the presence of a parole officer, and in violation of Kansas Department of Corrections rules governing parolee searches"). Neither factor is present here.

-15-

Finally, the Supreme Court's decision in <u>Georgia v. Randolph</u> does not help Mr. Blake. As we have noted, that case involved a search that occurred "over the express refusal of consent by a physically present resident." 547 U.S. at 120. Although <u>Randolph</u> does not address a resident's right to refuse to consent to a search when it is authorized by a co-resident's probation agreement, we need not consider how <u>Randolph</u> might apply under such facts. Here, there is no indication that Mr. Blake objected to the search.

In summary, the search of the Blakes' residence comported with Ms. Blake's probation agreement and was supported by reasonable suspicion. As a result, the district court properly denied Mr. Blake's motion to suppress.

## B. Admission of Expert Testimony from DCI Agent Norcross

Next, Mr. Blake argues that the district court erred in allowing DCI Agent Norcross to give opinion testimony about various practices used by drug dealers. In particular, Mr. Blake challenges Agent Norcross's testimony that (1) based on their training and experience, the DCI agents concentrated the search on the Blakes' bedroom; (2) drug dealers on the street typically sell certain quantities of methamphetamine; (3) as an investigator of controlled substances, he could identify the significance of prescription pain medications (i.e., that "[p]ersons on prescription medication sometimes will trade them for methamphetamine or other controlled substances," Rec. vol. IX, at 84; (4) baggies commonly contained a

-16-

certain quantity of methamphetamine (1 gram), id. at 89; (5) phrases used in records found in the Blakes' apartment had a certain meaning (i.e., "Bought ring 1.5" meant that "somebody gave a personal ring for a gram and a half of methamphetamine or a controlled substance" and "[b]ought craft set 2.0" meant that "somebody traded a craft set for two grams of methamphetamine"). Rec. vol. X, 174.

### 1. Standard of Review

We review a district court's ruling on the admissibility of evidence for an abuse of discretion. United States v. Zepeda-Lopez, 478 F.3d 1213, 1219 (10th Cir. 2007). In order to find an abuse of discretion, we must have "'a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" Id. at 1219 (quoting United States v. Griffin, 389 F.3d 1100, 1103 (10th Cir. 2004)).

Importantly, an error in admitting evidence warrants reversal only if the defendant establishes that "it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." United States v. Bornfield, 145 F.3d 1123, 1131 (10th Cir. 1998) (internal quotation marks omitted). In conducting this review, we examine the record *de novo*. United States v. Flanagan, 34 F.3d 949, 955 (10th Cir. 1994). "[We] examine the entire record, focusing particularly on the erroneously admitted statements. The question is not whether, omitting the inadmissible statements, the record contains sufficient

evidence for a jury to convict the defendant. Rather, we must discern whether the statements, in light of the whole record, substantially influenced the outcome of the trial, or whether we are left in grave doubt as to whether it had such an effect. If our answer to either of these questions is yes, the error requires reversal." United States v. Tome, 61 F.3d 1446, 1455 (10th Cir. 1995) (citations and quotations omitted). "[T]he government has the burden of proving that the non-constitutional error was harmless." Flanagan, 34 F.3d at 955.

## 2. Agent Norcross's Testimony

The record indicates that prior to trial, the government filed a Notice of Intent to Offer Expert Testimony pursuant to Fed. R. Crim. P. 16.[2] Rec. vol. I, doc. 54. The government summarized the anticipated testimony of Agent Norcross and two other law enforcement witnesses. As to Agent Norcross, the government reported that he had been a law enforcement officer for twelve years and had received in excess of 136 hours in controlled substance training and had worked in the area of narcotics investigation. The government stated that Agent Norcross would testify that based on his training and experience, the controlled substances seized in this case were intended for distribution rather than personal

---

[2] Rule 16(a)(1)(G) provides in part that "[a]t the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial."

consumption.  It added that Agent Norcross would testify as to "certain terms commonly used by drug traffickers, and the modus operandi of drug traffickers." Id. at 2.

At trial, Mr. Blake objected to the statements of opinion listed above, contending that Agent Norcross was testifying as an expert and that "[t]here's no Daubert motion filed to have him testify as an expert."  Rec. vol. IX, at 58. When Mr. Blake first objected, the district court overruled his objection and explained that "[t]here is no evidence of an expert opinion being offered."  Id. Subsequently, the court added, "I will say for the benefit of the record that it is the view of the Court that Agent Norcross is able to present a percipient [Fed. R. Evid.] 701 opinion based on his training and experience and that this is not . . . necessarily the subject of an expert report."  Rec. vol. X, at 177.

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As the district court observed, when scientific, technical or other specialized knowledge is not involved, opinion testimony may be admitted in certain circumstances. Under Federal Rule of Evidence 701,

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

"[A] person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." LifeWise Master Funding v. Telemark, 374 F.3d 917, 929 (10th Cir. 2004) (internal quotation marks omitted); see also FED. R. EVID. 701 (Adv. Comm. Notes (2000 Amend.)) ("[T]he distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by experts in the field.") (internal quotation marks omitted).

Importantly, "[b]oth Rules 701 and 702 distinguish between expert and lay testimony, not between expert and lay witnesses." United States v. Caballero, 277 F.3d 1235, 1247 (10th Cir. 2002). Thus, "it is possible for the same witness to provide both lay and expert testimony in a single case." Id. For example, the Ninth Circuit has held that law enforcement agents could testify as lay witnesses

that the defendant was acting suspiciously but that their statements that the defendant was using code words to refer to drug quantities and prices were based on extensive experience and constituted expert testimony. United States v. Figueroa-Lopez, 125 F.3d 1241, 1246 (9th Cir. 1997).

With regard to the challenged testimony of Agent Norcross, we note that this court, like many others, has applied Rule 702 to allow law enforcement agents to provide expert testimony concerning drug trafficking. See, e.g., United States v. Quintana, 70 F.3d 1167, 1170-71 (10th Cir. 1995) (detective's testimony about the meaning of terms used by drug traffickers); United States v. Sturmoski, 971 F.2d 452, 459 (10th Cir. 1992) (law enforcement agent's testimony about methamphetamine labs and the use of firearms in those labs); United States v. McDonald, 933 F.2d 1519, 1520-23 (10th Cir. 1991) (detective's testimony about the significance of certain quantities of cocaine, that people buying and selling cocaine often have single-edged razor blades in their possession, that crack cocaine is typically not sold in packages, and that crack cocaine is commonly exchanged for food coupons). Nevertheless, before such testimony may be admitted, the district court must make certain findings.

In particular, under Rule 702, the Supreme Court has held that district courts must perform a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993). That gatekeeping

-21-

requirement "applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999) (internal quotation marks omitted). The trial judge has broad discretion "to determine reliability in light of the particular facts and circumstances of the particular case." Id. at 158. That discretion extends to the procedures he or she uses to make that determination. United States v. Velarde, 214 F.3d 1204, 1208-09 (10th Cir. 2000). "Generally, the district court performs this [gatekeeping] function at a Daubert hearing, although such a hearing is not specifically required." Burlington Northern & Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1031 (10th Cir. 2007).

The district court may satisfy its gatekeeping function by ruling on an objection during trial, "so long as the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Goebel v. Denver & Rio Grande Western R.R. Co., 215 F.3d 1083, 1087 (10th Cir. 2000) (quoting Daubert, 509 U.S. at 597). However, the court must make specific findings on the record. Dodge v. Cotter Corp., 328 F.3d 1212, 1223 (10th Cir. 2003). "Without specific findings or discussion on the record, it is impossible on appeal to determine whether the district court carefully and meticulously reviewed the proffered . . . evidence or simply made an off-the-cuff decision to admit the expert testimony." Id. The failure to make the required findings constitutes an abuse of discretion. Id.

-22-

Here, we disagree with the district court that the challenged parts of Agent Norcross's testimony were lay opinions exempt from the requirements of Rule 702. In its pretrial filing, the government itself characterized the testimony as expert testimony. Moreover, the testimony at issue here was based on Agent Norcross's training and experience. His conclusions about the significance of the various items discovered in the Blake's residence could not have been "reached by any ordinary person." LifeWise Master Funding, 374 F.3d at 929 (internal quotation marks omitted); see Figueroa-Lopez, 125 F.3d at 1246 (concluding that testimony that the defendant's conduct was consistent with drug trafficking was expert opinion testimony subject to Rule 702). Because the district court improperly characterized these parts of Agent Norcross's testimony as lay opinion, it failed to make the necessary findings required to admit it under Rule 702. To that extent, the district court abused its discretion.

Importantly, the fact that expert testimony similar to Agent Norcross's has been admitted in other cases does not allow us, as an appellate court, to make independent findings of reliability. Velarde, 214 F.3d at 1210 n.5. Rather than performing the gatekeeping function ourselves, we must look to the other evidence in the record and determine whether it is sufficiently strong to permit the conclusion that the improper evidence had no effect upon the jury's decision. United States v. Turner, 285 F.3d 909, 914 (10th Cir. 2002).

Upon review of the trial record, we are convinced that the challenged statements of opinion did not substantially influence the outcome of the trial. The testimony of Mr. Brown, Ms. Camblin, Mr. Turner, and Mr. Burke, as well as Mr. Blake's own admissions in the interviews with the DCI agents, and the physical evidence discovered in the Blakes' residence (without the explanations of Agent Norcross) provided strong support for the government's contention that Mr. Blake had conspired to distribute methamphetamine and had possessed the drug with the intent to distribute it. In light of the strength of this evidence, we are confident that Agent Norcross's improperly admitted opinion testimony did not influence the jury's verdict. Cf. Kinser v. Gehl Co., 184 F.3d 1259, 1272 (10th Cir. 1999) (concluding that the improper admission of expert testimony "ultimately was harmless"), abrogated on other grounds by Weisgram v. Marley Co., 528 U.S. 440 (2000).

### C. Ms. Blake's out-of-court statement

Over Mr. Blake's objection, the district court allowed DCI Agent Weischedel to testify that, during the search, Ms. Blake stated that the money in the safe had come from the sale of electronics equipment. Mr. Blake now argues that this out-of-court statement should have been excluded on the grounds that it was hearsay and violated his rights under the Confrontation Clause of the Sixth Amendment.

We discern no error in the admission of this testimony. As the government notes, Ms. Blake's statements about the source of the money were not offered to prove the truth of the matter asserted (that the money came from electronics equipment sales) but rather to show that the Blakes' inconsistent answers to the questions about the money supported the government's claim that the money came from the sale of illegal drugs. Thus, the statement was not hearsay, and its admission did not violate Mr. Blake's Confrontation Clause rights. See United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008) (noting that "'"[h]earsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted'") (quoting FED. R. EVID. 801(c)); United States v. Faulkner, 439 F.3d 1221, 1226 (10th Cir. 2006) ("[T]he [Confrontation] Clause has no role unless the challenged out-of-court statement is offered for the truth of the matter asserted in the statement.").

In any event, we are confident that this statement from Ms. Blake did not influence the verdict.

### D. Plea agreements of government witnesses

Finally, Mr. Blake argues that the plea agreements of two government witnesses (Chris Sanders and Darrin Brown) were improperly admitted over his

objection. He maintains that the admission of these plea agreements constituted improper vouching.

Again, Mr. Blake's arguments are not persuasive. "[I]t is perfectly permissible for a prosecutor to introduce a witness's plea agreement on direct examination, even if it includes a truthfulness provision" and "[a] prosecutor may also discuss the truthfulness provision and make sure the witness is aware of the consequences of failing to tell the truth." United States v. Harlow, 444 F.3d 1255, 1262 (10th Cir. 2006) (internal citations omitted). "Use of the 'truthfulness' portions of [plea] agreements becomes impermissible vouching only when the prosecutors explicitly or implicitly indicate that they can monitor and accurately verify the truthfulness of the witness' testimony." United States v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990). Upon review of the record, there is no indication here that the prosecutor crossed that line by engaging in impermissible vouching.

### III. CONCLUSION

We therefore AFFIRM Mr. Blake's convictions and sentence.

Entered for the Court

Robert H. Henry
Chief Circuit Judge

-26-